1  JODI LINKER, Bar No. 230273
   Federal Public Defender
2  Northern District of California
   ANAIS CARELL, Bar No. 354346
3  Fellowship Assistant Federal Public Defender
   13th Floor Federal Building - Suite 1350N
4  1301 Clay Street
   Oakland, CA 94612
5  Telephone:   (510) 637-3500
   Facsimile:   (510) 637-3507
6  Email:       Anais_Carell@fd.org

7

8  Counsel for Defendant Godfrey

9

10            IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     OAKLAND DIVISION

13

14  UNITED STATES OF AMERICA,          **Case No.:** CR 25–00260 AMO (TSH)

15           Plaintiff,                **DEFENDANT'S MEMORANDUM IN
                                        SUPPORT OF RELEASE**
16       v.
                                        **Hearing Date:**   September 16, 2025
17  JERMAINE GODFREY,                   **Hearing Time:**    10:30 a.m.

18           Defendant.

19

20        Jermaine Godfrey is a lifelong Oakland resident, a father to four children, and the son of an

21  aging mother who recently underwent surgery and suffered a heart attack. This matter is his first

22  federal criminal case. He has two strong, proposed sureties who know him well and are eager to sign

23  a bond on his behalf. Contrary to the government's representations in its Memorandum in Support of

24  Detention, Dkt. 8 ("Gov. Memo"), and at the initial detention hearing, Mr. Godfrey was not, nor was

25  he ever alleged to be, the shooter in the 2015 Alameda County manslaughter case. Rather, his

26  criminal history is dated, largely non-violent, and reflects drug-related arrests and convictions. *See*

27  Pre-Bail Report at 5-14. The defense submits this memorandum in support of its request for Mr.

28  Godfrey's release.

On September 9, 2025, Mr. Godfrey had his initial appearance on a federal Indictment charging him with: one count of felon in possession of a firearm and ammunition, a violation of 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)"); and a forfeiture allegation. Dkts. 1, 5. This Court held an initial detention hearing on September 12, 2025, and it set a further detention hearing for September 15, 2025. Dkt. 9. The further detention hearing was rescheduled to September 16, 2025. Dkt. 11.

The defense submits this memorandum to provide information to the Court that will reasonably assure the protection of the community and mitigate concerns regarding danger.

## I.   The government's burden of proof is preponderance of the evidence for flight risk, and clear and convincing evidence for dangerousness.

Criminal defendants are ordinarily entitled to release before trial. *See United States v. Motamedi,* 767 F.2d 1403, 1405 (9th Cir. 1985). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act ("BRA") statute states a judge "shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court." 18 U.S.C. § 3142(b). Where the judge finds release on either of the two conditions above "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," *still* the "judicial officer *shall* order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions." 18 U.S.C. § 3142(c)(1), (c)(1)(B). Only in "rare circumstances" may a court order a defendant detained pending trial. *Motamedi,* 767 F.2d at 1405. Pretrial release "should be denied only for the strongest of reasons." *Id.* at 1407 (citation omitted).

Felon in possession of a firearm pursuant to Section 922(g)(1), the crime with which Mr. Godfrey is charged, "is not a crime of violence that triggers a presumption of danger to the community or flight risk." *U.S. v. Hasan*, 2009 WL 4251644, at *2 (N.D. Cal. Nov. 24, 2009); *U.S. v. Twine*, 344 F.3d 987, 988 (9th Cir. 2003). The government thus bears the burden of proving first that Mr. Godfrey poses a danger to the community or risk of flight, and then that there is no condition or combination of conditions which will reasonably assure the safety of the community and his appearance in court, where the standard of proof is clear and convincing evidence as to danger and

preponderance of the evidence as to flight. *See* 18 U.S.C. § 3142(e)-(f); *see also Motamedi,* 767 F.2d at 1406–07. The government does not meet that burden as to either factor.

## II. Strict release conditions will reasonably assure the safety of the community upon Mr. Godfrey's release

In its Memorandum in Support of Detention and at the initial detention hearing, the government relied upon and inaccurately represented Mr. Godfrey's criminal history in order to paint him as a danger to the community. *See* Gov. Memo. The government discussed, at length, Mr. Godfrey's involvement in a 2015 death and his subsequent conviction for voluntary manslaughter, stating that he personally walked up to and shot the victims in that case. *See* Gov. Memo at 4. This is incorrect. In fact, the information filed in the case indicates that Mr. Godfrey was never suspected of or charged with being the shooter. *See* Exhibit A at 3, 5 (showing that co-defendant Dwight Bradford, alone, was charged with discharge of a firearm). And while Mr. Godfrey's judgment included no enhancements, Mr. Bradford's judgment included an enhancement under California Penal Code § 12022.5, personal use of a firearm in a felony. *See* Exhibits B, C. In fact, at the preliminary hearing, testimony was elicited that Mr. Godfrey did not know what Mr. Bradford would do upon leaving Mr. Godfrey's car, that Mr. Godfrey was not seen with a gun on the day of the incident, and that Mr. Godfrey and Mr. Bradford did not discuss the shooting prior to it occurring. *See* Exhibit D at 154-66. A review of the information, judgments, or preliminary hearing transcript would have made immediately clear that Mr. Godfrey was never charged with, nor did he plead to, being the shooter in the 2015 case.

The government's inaccurate representation undermines its danger to the community argument. Mr. Godfrey was not the shooter and, in 2020, he accordingly received a six-year sentence. *See* Ex. B. Because Mr. Godfrey had already spent five years in custody and had 3,620 total days of credit at the time of sentencing, he was released shortly after sentencing. *See id.* In other words, the sentencing judge imposed Mr. Godfrey's judgment with the understanding that he would re-enter the community and, presumably, with the belief that Mr. Godfrey could safely live in the community.

Since Mr. Godfrey's release in 2020, he has incurred no new convictions. *See* Pre-Bail Report at 13-14. He has incurred no pretrial release violations or failures to appear. *See id.* His prior convictions and probation revocations are dated and largely indicate a pattern of drug-related

offenses.[1] But courts have previously found that a "pattern of street-level distribution of narcotics . . . [does not] warrant pretrial detention." *U.S. v. Diaz*, 2019 WL 1993786, at *3 (D. Mass. May 6, 2019).

Moreover, Mr. Godfrey is proposing extraordinarily strict release conditions, which will reasonably ensure the safety of the community. A court may only detain a defendant where "the [g]overnment shows by clear and convincing evidence that ***no*** release condition will reasonably assure the safety of the community." *United States v. Parodi*, 2008 WL 683421, at *2 (N.D. Cal. Mar. 7, 2008) (emphasis added). Specifically, "detention may be ordered where the court find ***no condition or combination of conditions*** could prevent the defendant's continued or future criminal activity." *Id.* (citing *Salerno*, 481 U.S. at 739) (emphasis added). Here, Mr. Godfrey proposes that he be placed on home detention with location monitoring, at his mother's home, with permission to leave his residence only for medical appointments, legal appointments, court hearings, and other activities pre-approved by Pretrial Services. Mr. Godfrey would report weekly by telephone to Pretrial Services, to keep his officer appraised of his whereabouts and appointments. He would be subject to random visits by his pretrial officer. This strict arrangement will ensure the community's safety while allowing him to care for his elderly mother, who is recovering from surgery and a heart attack, watch his 1-year-old son, and continue to spend time with his other children, including his 3-year-old daughter with Down syndrome. Mr. Godfrey's children and family rely upon his presence, and he knows that if he were to violate the conditions of his pretrial release, he would be brought back to custody at Taft Correctional Institution—a nearly 5-hour drive away from his loved ones.

Mr. Godfrey is also aware that, were he to violate the conditions of his release, he would put his two proposed sureties at risk. Mr. Godfrey's first surety, Necole Crawford, is his long-time partner with whom he shares a 1-year-old son. Ms. Crawford is employed full-time by Aetna, has no criminal history, and attended Mr. Godfrey's initial detention hearing. *See* Pre-Bail Report at 2. Ms. Levi, Mr. Godfrey's second proposed surety, is Mr. Godfrey's niece.[2] She is 38 years old, lives in this

---

[1] Though the government relied upon Mr. Godfrey's probation revocations and modifications in its argument for detention, his most recent revocation, modification, or violation appears to date back to 2008, approximately seventeen years ago. *See* Pre-Bail Report at 11.

[2] Ms. Levi was not interviewed by Pretrial Services but is planning to attend the further detention hearing on September 16.

District, sees Mr. Godfrey almost weekly, and has worked as an accounting coordinator at a behavioral health group for the past decade. Mr. Godfrey's strong sureties, in combination with his strict proposed release conditions, are more than sufficient to reasonably ensure the safety of the community. *See, e.g., United States v. Cross*, 389 F. Supp. 3d 140, 142 (D. Mass. 2019) (finding that very strict conditions, including constant supervision by a third-party custodian and home detention with location monitoring, reasonably ensured community safety even though the "charges against the defendant [were] horrendous in nature"); *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991) (finding that a set of "innovative and extensive" conditions of release, amounting to "pre-trial house arrest," were sufficient to mitigate danger to the community in a Mafia RICO case); *United States v. Miller*, 2018 WL 6977619, at *8 (S.D. Fla. Dec. 13, 2018) ("The electronic monitoring and home detention ameliorate the risk that the Defendant will personally obtain or distribute drugs.").

Finally, the government must demonstrate that Mr. Godfrey *actually* poses a danger, not that he poses a danger in theory. *See Patriarca*, 948 F.2d at 792; *United States v. Marquez*, 2018 WL 4773152, at *3 (N.D. Cal. Oct. 3, 2018) (finding that a gun sale defendant no longer posed a danger because the guns were seized); *Miller*, 2018 WL 6977619, at *8 (holding that once a drug dealer was arrested, other drug dealers avoided her). Here, Mr. Godfrey's alleged weapons and contraband were confiscated. *See* Gov. Memo at 1-2. It is unrealistic to suspect that Mr. Godfrey will obtain weapons or violate the law while he is: supervised by federal Pretrial Services; under investigation by federal agents; on location monitoring and home detention; relying on two sureties; and subject to an ongoing federal criminal case. The proposed strict release conditions therefore reasonably ensure the safety of the community.

### III. Mr. Godfrey presents no risk of flight because he is a lifelong Oakland resident, has no history of travel, and has no recent failures to appear

Mr. Godfrey understands that this Court and Pretrial Services are primarily concerned with the safety of the community. *See* Pre-Bail Report at 15. However, because the government has moved for detention based in part on flight risk, Mr. Godfrey briefly discusses that factor here. *See* Gov. Memo at 5-6.

"On a motion for pretrial detention, the government bears the burden of showing by a

1  preponderance of the evidence that the defendant poses a flight risk." *United States v. Santos-Flores*,

2  794 F.3d 1088, 1090 (9th Cir. 2015). The government must show a "serious risk of flight": namely,

3  "a great risk – beyond average – that the defendant will intentionally and actively move within or

4  outside the jurisdiction to avoid court proceedings in supervision." *United States v. Figueroa-Alvarez*,

5  681 F. Supp. 3d 1131, 1138 (9th Cir. 2023). In evaluating risk of flight, a court takes into account

6  factors including the history and characteristics of the defendant, family ties, financial resources,

7  length of residence in the community, community ties, past conduct, criminal history, and record

8  concerning appearance at court proceedings. *See Motamedi*, 767 F.2d at 1407 (citing 18 U.S.C.

9  § 3142(g)).

10       Mr. Godfrey poses no, let alone a serious, risk of flight. While the Pre-Bail Report indicates a

11  history of past convictions, it also shows that Mr. Godfrey has no recent failures to appear for court

12  proceedings. *See* Pre-Bail Report at 4-14. His most recent failure to appear stems from a traffic

13  misdemeanor charge in 2001, over two decades ago. *See id.* at 7. He was arrested without incident in

14  this case. *See id.* at 14. Mr. Godfrey has spent his entire life in Oakland. *See id.* at 1. *Compare United*

15  *States v. Hayes*, 2013 WL 2181671, at *3 (N.D. Cal. May 20, 2013) (finding that aggravating factors

16  as to flight risk include previous failures to appear in court and a lack of stable residence history). He

17  has no passport and no history of travel outside of the country. Pre-Bail Report at 2. *See Hayes*, 2013

18  WL 2181671, at *3 (finding that mitigating factors as to flight risk include long-time ties to the

19  district, lack of passport, and lack of international travel). His entire family lives in the Bay Area,

20  including his mother, siblings, children, nieces, and girlfriend. *See* Pre-Bail Report at 1, 3. He is

21  simply not a flight risk.

22  **IV.    Conclusion**

23       Home detention at his mother's residence, while he is monitored by multiple sureties and

24  supervised by Pretrial Services, is a safe and structured release plan for Mr. Godfrey. The release plan

25  would also allow him to care for his mother and receive visits from his young children. The defense

26  respectfully requests that the Court grant Mr. Godfrey's release in accordance with the BRA.

27

28

1

2      Dated:      September 15, 2025                    Respectfully submitted,

3
                                                        JODI LINKER
4                                                       Federal Public Defender
                                                        Northern District of California
5
                                                                     /S
6                                                       _____
                                                        ANAIS CARELL
7                                                       Fellowship Assistant Federal Public Defender

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  NANCY E. O'MALLEY
   District Attorney
2  900 Courthouse                          E-FILED
   1225 Fallon Street                      ALAMEDA COUNTY
3  Oakland, CA 94612-4292                  6/19/2017
   (510) 272-6222                          CLERK OF THE SUPERIOR COURT
4                                          /s/ Keesha McLen

5  EDWARD VIEIRA-DUCEY
   Deputy District Attorney
6  State Bar #251405

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                        **COUNTY OF ALAMEDA**
8                   **RENE C. DAVIDSON COURTHOUSE**

9  PEOPLE OF THE STATE OF CALIFORNIA

10                                          NO.  607711A/B
                                           INFORMATION
11              v.

12 **JERMAINE GODFREY**                     PFN:  AYW627      CEN:  5320362

13 **DWIGHT BRADFORD**                      PFN:  BJV159      CEN:  5322635

14

15                    Defendant(s).

16

17 The  District  Attorney  of  the  County  of  Alameda  by  this  Information  hereby  accuses

18 JERMAINE GODFREY  and  DWIGHT  BRADFORD  of a Felony, to wit:    MURDER, a

19 violation of section 187(a) of the PENAL CODE of California, in that on or about July 10, 2014,

20 in the County of Alameda, State of California, said defendant(s) did unlawfully, and with malice

21 aforethought, murder AYANA MARIE DOMINGUEZ, a human being.

22 "NOTICE:    The above offense is a serious felony within the meaning of Penal Code section

23 1192.7(c) and a violent felony within the meaning of Penal Code section 667.5(c)."

24

25

26 Office of the
   District Attorney
   Alameda County
27 California

28

File Date: 6/19/2017/as

1   "NOTICE:  Conviction of this offense will require you to provide specimens and samples

2   pursuant to Penal Code section 296.  Willful refusal to provide the specimens and samples is a

3   crime."

4   **ARMED WITH FIREARM CLAUSE AS TO DEFENDANT JERMAINE GODFREY**

5   It is further alleged as against defendant JERMAINE  GODFREY that in the commission and

6   attempted commission of the above offense a principal in said offense was armed with a firearm,

7   said arming not being an element of the above offense, within the meaning of Penal Code section

8   12022(a)(1).

9   **NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO**

10  **DEFENDANT JERMAINE GODFREY**

11  It is further alleged that the above offense is a violent felony within the meaning of Penal Code

12  section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the

13  offenses herein charged shall be served in the state prison.

14  **OFFENSE WHILE ON BAIL OR O.R. CLAUSE AS TO**

15  **DEFENDANT JERMAINE GODFREY**

16  It is further alleged as to count one, that at the time of the commission of the above offense, the

17  defendant JERMAINE GODFREY, was released from custody on bail or Own Recognizance in

18  Case Number 588695 within the meaning of Penal Code section 12022.1.

19  **OFFENSE WHILE ON BAIL OR O.R. CLAUSE AS TO**

20  **DEFENDANT JERMAINE GODFREY**

21  It is further alleged as to count one, that at the time of the commission of the above offense, the

22  defendant JERMAINE GODFREY, was released from custody on bail or Own Recognizance in

23  Case Number 588074A within the meaning of Penal Code section 12022.1.

Office of the
District Attorney
Alameda County
California

## PERSONAL AND INTENTIONAL DISCHARGE OF A FIREARM, GBI CLAUSE AS TO DEFENDANT DWIGHT BRADFORD

It is further alleged as to the above count that said defendant DWIGHT BRADFORD personally and intentionally discharged a firearm, and caused great bodily injury and death to AYANA MARIE DOMINGUEZ within the meaning of Penal Code sections 12022.7(a) and 12022.53(d). It is further alleged that said defendant personally inflicted great bodily injury on another person within the meaning of Penal Code section 12022. It is further alleged that said defendant personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53(c). It is further alleged that said defendant personally used a firearm within the meaning of Penal Code sections 12022.5(a) and 12022.53(b) and 12022.53(g).

## NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO DEFENDANT DWIGHT BRADFORD

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

Office of the
District Attorney
Alameda County
California

**SECOND COUNT**

And the said JERMAINE GODFREY and DWIGHT BRADFORD are further accused by the District Attorney of the County of Alameda, by the second count of this Information, of a Felony, to wit:   WILLFUL, DELIBERATE, PREMEDITATED ATTEMPTED MURDER, a violation of section 187(a)/664(a) of the PENAL CODE of California, in that on or about July 10, 2014, in the County of Alameda, State of California, said defendant(s) did unlawfully and with malice aforethought, attempt to murder ALFONSO OCON, a human being.  It is further alleged that the aforesaid attempted murder was committed willfully, deliberately and with premeditation within the meaning of Penal Code section 664(a) and is a serious felony pursuant to Penal Code section 1192.7(c).

"NOTICE:   Conviction of this offense will require you to provide specimens and samples pursuant to Penal Code section 296.  Willful refusal to provide the specimens and samples is a crime."

**ARMED WITH FIREARM CLAUSE AS TO DEFENDANT JERMAINE GODFREY**

It is further alleged as against defendant JERMAINE  GODFREY that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm, said arming not being an element of the above offense, within the meaning of Penal Code section 12022(a)(1).

**NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO DEFENDANT JERMAINE GODFREY**

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

Office of the
District Attorney
Alameda County
California

## OFFENSE WHILE ON BAIL OR O.R. CLAUSE AS TO

## DEFENDANT JERMAINE GODFREY

It is further alleged as to count two, that at the time of the commission of the above offense, the defendant JERMAINE GODFREY, was released from custody on bail or Own Recognizance in Case Number 588695 within the meaning of Penal Code section 12022.1.

## OFFENSE WHILE ON BAIL OR O.R. CLAUSE AS TO

## DEFENDANT JERMAINE GODFREY

It is further alleged as to count two, that at the time of the commission of the above offense, the defendant JERMAINE GODFREY, was released from custody on bail or Own Recognizance in Case Number 588074A within the meaning of Penal Code section 12022.1.

## PERSONAL AND INTENTIONAL DISCHARGE OF A FIREARM, GBI CLAUSE AS

## TO DEFENDANT DWIGHT BRADFORD

It is further alleged as to the above count that said defendant DWIGHT BRADFORD personally and intentionally discharged a firearm, and caused great bodily injury and death to ALFONSO OCON within the meaning of Penal Code sections 12022.7(a) and 12022.53(d). It is further alleged that said defendant personally inflicted great bodily injury on another person within the meaning of Penal Code section 12022. It is further alleged that said defendant personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53(c). It is further alleged that said defendant personally used a firearm within the meaning of Penal Code sections 12022.5(a) and 12022.53(b) and 12022.53(g).

Office of the
District Attorney
Alameda County
California

## NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO DEFENDANT DWIGHT BRADFORD

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

## FIRST PRIOR CONVICTION AS TO DEFENDANT JERMAINE GODFREY

The District Attorney of the County of Alameda further charges that before the commission of the offense specified above, said defendant JERMAINE GODFREY, on or about August 31, 2004, was convicted in the Superior Court of the State of California, in and for the County of ALAMEDA, of the crime of a Felony, to wit: SALE/TRANSPORTATION/OFFER TO SELL CONTROLLED SUBSTANCE, a violation of section 11352(a) of the HEALTH AND SAFETY CODE of California, and received a prison term therefor.

## PRIOR SEPARATE PRISON TERM (PC 667.5(B))

It is further alleged that the above prior conviction is within the purview of Penal Code section 667.5(b) and that a separate term of imprisonment was served therefor as described in Penal Code section 667.5 for said offense, and that the defendant did not remain free of prison custody for, and did commit an offense resulting in a felony conviction during, a period of five years subsequent to the conclusion of said term.

1

**SECOND PRIOR CONVICTION AS TO DEFENDANT JERMAINE GODFREY**

2

3

The District Attorney of the County of Alameda further charges that before the commission of

4

the offense specified above, said defendant JERMAINE GODFREY, on or about

5

January 20, 1998, was convicted in the Superior Court of the State of California, in and for the

6

County of ALAMEDA, of the crime of a Felony, to wit: SALE/TRANSPORTATION/OFFER

7

TO SELL CONTROLLED SUBSTANCE, a violation of section 11352(a) of the HEALTH AND

8

SAFETY CODE of California, and received a sentence of probation therefor.

9

10

11

12

13

14

Pursuant to Penal Code Section 1054(b), the People are hereby informally requesting that

15

defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

16

17

NANCY E. O'MALLEY
District Attorney

18

19

20

By:  EDWARD VIEIRA-DUCEY
Deputy District Attorney

21

22

23

24

25

26

27

28

Office of the
District Attorney
Alameda County
California

# EXHIBIT B

**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**
**SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM**
*Not to be used for multiple count convictions or for 1/3 consecutive sentences)*    **CR-290.1**

...HIA, COUNTY OF: **ALAMEDA**

FILED
ALAMEDA COUNTY
JUN 3 0 2020
CLERK OF THE SUPERIOR COURT
By _____ Deputy

PEOPLE OF THE STATE OF CALIFORNIA vs.    DOB: 07/29/1979
DEFENDANT: **JERMAINE GODFREY**
AKA:
CII NO.: 5320362
BOOKING NO.: PFN: AYW627    CEN: 5320362    ☐ NOT PRESENT

CASE NUMBER: **607711A**

FELONY ABSTRACT OF JUDGMENT    ☐ AMENDED ABSTRACT
☑ PRISON COMMITMENT    ☐ COUNTY JAIL COMMITMENT

DATE OF HEARING: June 29, 2020    DEPT. NO.: 011    JUDGE: Kevin Murphy

CLERK: Barbara Cuevas    REPORTER: Sherree Young    PROBATION NO. OR PROBATION OFFICER: Kristen Wells    ☐ IMMEDIATE SENTENCING

COUNSEL FOR PEOPLE: Tim Wagstaffe, Deputy District Attorney    COUNSEL FOR DEFENDANT: Ernesto Castillo, Attorney at Law    ☐ APPOINTED

1. Defendant was convicted of the commission of the following felony:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | JURY | COURT | PLEA | TERM (L.M.U) | SERIOUS FELONY | VIOLENT FELONY | TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | PC | 192(a) | Voluntary Manslaughter | 2014 | 06/01/2020 | | | X | M | | | 6 | 0 |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed, "S," for stayed, or "PS" for punishment struck. DO NOT LIST ENHANCEMENTS FULLY STRICKEN by the court.

| COUNT. | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTIONS OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed, "S," for stayed, or "PS" for punishment struck. DO NOT LIST ENHANCEMENTS FULLY STRICKEN by the court.

| ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | TOTAL |
|---|---|---|---|---|---|---|
| | | | | | | |

4. Defendant sentenced: ☐ to county jail per PC 1170(h)(1) or (2) ☐ per PC 667(b)-(i) or PC 1170.12 (strike prior)
☐ to prison per PC 1170(a) or 1170(h)(3) due to ☐ current or prior serious or violent felony ☐ PC 290 or ☐ PC 186.11 enhancement
☐ PC 1170(a)(3). Pre-confinement credits equal or exceed time imposed. ☑ Defendant ordered to report to local parole or probation office upon release.

5. FINANCIAL OBLIGATIONS (plus any applicable penalty assessments):
Restitution Fine(s): $10000 per PC1202.4 (b) forthwith per PC 2085.5 if prison commitment  $10000 per PC 1202.45 suspended unless parole is revoked.
$_____ per PC 1202.44 is now due, probation having been revoked.
Restitution per PC1202.4 (f): ☑ $9,707 ☐ Amount to be determined to ☐ * victim(s) ☑ Restitution Fund
* ☐ Victim name(s), if known, and amount breakdown in item 8, below.   * ☐ Victim name(s) in probation officer's report.
Fine(s): $_____ per PC 1202.5. $_____ per PC 23550 or_____ days ☐ county jail ☐ prison in lieu of fine ☐ concurrent ☐ consecutive
☐ Includes: ☐ $_____ Lab Fee per HS 11372.5(a) ☐ $_____ Drug Program Fee per HS 11372.7(a) for each qualifying offense.
☑ Court Operations Assess.: $ 40 per PC 1465.8. ☑ Conviction Assess.:30 per GC 70373. ☐ Other: $_____ per (specify): _____

6. TESTING:    a. ☑ Compliance with PC 296 verified    b. ☐ AIDS per PC 1202.1    c. ☐ other (specify): _____
7. IMMEDIATE SENTENCING: ☐ Probation to prepare and submit a post sentence report to CDCR per PC 1203c. Deft's Race / National Origin Blk
8. Other orders (specify): Firearm is ordered destroyed.

9. TOTAL TIME IMPOSED: | 6 | 0 |

10. ☐ MANDATORY SUPERVISION: Execution of a portion of the total jail time imposed in item 9 is suspended and deemed a period of mandatory supervision under PC 1170(h)(5)(B) as follows: Suspended portion:_____ Served forthwith:_____
11. ☐ This sentence is to run concurrent with (specify):_____    12. Registration Required: ☐ per (specify code section):_____
13. Execution of sentence imposed: a. ☑ at initial sentencing hearing. b. ☐ at resentencing per decision on appeal. c. ☐ after revocation of probation.
d. ☐ at resentencing per recall of commitment. (PC 1170(d).)   e. ☐ other (specify):_____

14.
| DATE SENTENCE PRONOUNCED | CREDIT FOR TIME SPENT IN CUSTODY TOTAL DAYS: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | TIME SERVED IN STATE INSTITUTION |
|---|---|---|---|---|
| June 29, 2020 | 3620 | 1810 | 1810   ☐ 2933 ☐ 2933.1 ☑ 4019 | DMH [ ]  CDCR [ ]  CRC [ ] |

15. The defendant is remanded to the custody of the sheriff ☐ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays.
To be delivered to ☐ the reception center designated by the director of the California Department of Corrections and Rehabilitation.
☐ county jail ☑ Other (specify): Paper Commitment

**CLERK OF THE COURT:** I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE _____    DATE June 30, 2020

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.
Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
CR-290.1 [Rev. July 1, 2012]

**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**
**SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM**

Penal Code,
§§ 1170, 1213, 1213.5

# EXHIBIT C

**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**
**SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM**
*(Not to be used for multiple count convictions or for 1/3 consecutive sentences)*

CR-290.1

...NIA, COUNTY OF:

ALAMEDA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA vs.    DOB: 01/28/1993 | CASE NUMBER |
| DEFENDANT: **DWIGHT BRADFORD** | 607711B |
| AKA: | |
| CII NO.: 29291543 | |
| BOOKING NO.: PFN: BJV159  CEN:5322635    ☐ NOT PRESENT | |

**F I L E D**
**ALAMEDA COUNTY**
**OCT - 8 2020**
CLERK OF THE SUPERIOR COURT
By_____
Deputy

| FELONY ABSTRACT OF JUDGMENT | ☐ AMENDED ABSTRACT |
|---|---|
| ☑ PRISON COMMITMENT   ☐ COUNTY JAIL COMMITMENT | |

| DATE OF HEARING | DEPT. NO. | |
|---|---|---|
| October 5, 2020 | 011 | JUDGE **KEVIN MURPHY** |

| CLERK | REPORTER | PROBATION NO. OR PROBATION OFFICER | ☐ IMMEDIATE SENTENCING |
|---|---|---|---|
| Barbara Cuevas | Andrienne Peretti | Kristen Wells | |

| COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | ☐ APPOINTED |
|---|---|---|
| Tim Wagstaffe, Deputy District Attorney | Michal Tal, Attorney at Law | |

1. Defendant was convicted of the commission of the following felony:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | COURT | PLEA | TERM (L.M.U) | SERIOUS FELONY | VIOLENT FELONY | TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 192(a) | Voluntary Manslaughter | 2014 | 07/20/2020 | | | X | M | | | 6 | 0 |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed, "S" for stayed, or "PS" for punishment struck. DO NOT LIST ENHANCEMENTS FULLY STRICKEN by the court.

| COUNT | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| 1 | 12022.5(a) | 4 | | | | | 4 | 0 |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTIONS OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed, "S" for stayed, or "PS" for punishment struck. DO NOT LIST ENHANCEMENTS FULLY STRICKEN by the court.

| ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | ENHANCEMENT | TIME IMPOSED, "S," or "PS" | TOTAL | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

4. Defendant sentenced: ☐ to county jail per PC 1170(h)(1) or (2) ☐ per PC 667(b)-(i) or PC 1170.12 (strike prior)
☐ to prison per PC 1170(a) or 1170(h)(3) due to ☐ current or prior serious or violent felony ☐ PC 290 or ☐ PC 186.11 enhancement
☐ PC 1170(a)(3). Pre-confinement credits equal or exceed time imposed. ☐ Defendant ordered to report to local parole or probation office upon release.

5. FINANCIAL OBLIGATIONS (plus any applicable penalty assessments):
Restitution Fine(s): $3000 per PC1202.4 (b) forthwith per PC 2085.5 if prison commitment  $3000 per PC 1202.45 suspended unless parole is revoked.
$_____ per PC 1202.44 is now due. probation having been revoked.
Restitution per PC1202.4 (f): ☐ $_____ Amount to be determined to _____ * victim(s) ☐ Restitution Fund
* ☐ Victim name(s), if known, and amount breakdown in item 8, below. ☑ Victim name(s) in probation officer's report.
Fine(s): $_____ per PC 1202.5. $_____ per VC 23550 or _____ days ☐ county jail ☐ prison in lieu of fine ☐ concurrent ☐ consecutive
☐ Includes: ☐ $_____ Lab Fee per HS 11372.5(a) ☐ $_____ Drug Program Fee per HS 11372.7(a) for each qualifying offense.
☑ Court Operations Assess.: $40 per PC 1465.8. ☑ Conviction Assess.: 30 per GC 70373. ☐ Other: $_____ per (specify): _____

6. TESTING:    a. ☐ Compliance with PC 296 verified   b. ☐ AIDS per PC 1202.1   c. ☐ other (specify): _____
7. IMMEDIATE SENTENCING: ☐ Probation to prepare and submit a post sentence report to CDCR per PC 1203c. Deft's Race / National Origin Blk
8. Other orders (specify): Restitution reserved and to be determined.

| 9. TOTAL TIME IMPOSED: | 10 | 0 |
|---|---|---|

10. ☐ MANDATORY SUPERVISION: Execution of a portion of the total jail time imposed in item 9 is suspended and deemed a period of mandatory supervision under PC 1170(h)(5)(B) as follows: Suspended portion: _____ Served forthwith: _____

11. ☐ This sentence is to run concurrent with (specify): _____    12. Registration Required: ☐ per (specify code section): _____

13. Execution of sentence imposed: a. ☑ at initial sentencing hearing. b. ☐ at resentencing per decision on appeal. c. ☐ after revocation of probation.
d. ☐ at resentencing per recall of commitment. (PC 1170(d).) e. ☐ other (specify): _____

14.
| DATE SENTENCE PRONOUNCED | CREDIT FOR TIME SPENT IN CUSTODY TOTAL DAYS: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | TIME SERVED IN STATE INSTITUTION |
|---|---|---|---|---|
| October 5, 2020 | 2172 | 1889 | 283   ☐ 2933  ☑ 2933.1  ☐ 4019 | DMH [ ]   CDCR [ ]   CRC [ ] |

15. The defendant is remanded to the custody of the sheriff ☑ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays.
To be delivered to ☑ the reception center designated by the director of the California Department of Corrections and Rehabilitation.
☐ county jail    ☐ Other (specify): _____

**CLERK OF THE COURT:** I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE October 8, 2020 |
|---|---|

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
CR-290.1 [Rev. July 1, 2012]

**FELONY ABSTRACT OF JUDGMENT—DETERMINATE**
**SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM**

Penal Code,
§§ 1170, 1213, 1213.5

# EXHIBIT D

1

2

3

4

5          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

6              IN AND FOR THE COUNTY OF ALAMEDA

7          BEFORE THE HONORABLE RHONDA BURGESS, JUDGE

8                    DEPARTMENT NO. 5

9                       ---oOo---

10    PEOPLE OF THE STATE OF CALIFORNIA,

11         PLAINTIFF,

12    VS.                                NO.  607711-8A

13                                       NO.  607711-8B

14    JERMAINE GODFREY, DWIGHT BRADFORD,

15         DEFENDANT(S).

**CERTIFIED TRANSCRIPT**

16    _____/

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 RENE C. DAVIDSON BUILDING
                     1225 FALLON STREET
19              OAKLAND, CALIFORNIA 94612

20               PRELIMINARY HEARING

21          5/30/2017, 6/5/17, 6/6/17

22

23               A P P E A R A N C E S

24    FOR THE PEOPLE:              FOR DEFENDANT GODFREY:
      KEVIN IKUMA                  ERNESTO CASTILLO
25    DEPUTY DISTRICT ATTORNEY     ATTORNEY AT LAW

26                                 FOR DEFENDANT BRADFORD:
                                   MIKI TAL
27                                 ATTORNEY AT LAW

28

PLAINTIFF vs JERMAINE GODFREY
607711-8A                          May 30, 2017                          Page 2

```
 1                    INDEX OF WITNESSES

 2                        6/5/2017

 3

     ASHLEY BUGGS
 4   DIRECT EXAMINATION BY MR. IKUMA                      23
     CROSS-EXAMINATION BY MR. CASTILLO                    96
 5   CROSS-EXAMINATION BY MS. TAL                        103

 6   SGT. NICHOLAS CALONGE
     DIRECT EXAMINATION BY MR. IKUMA                     111
 7   CROSS-EXAMINATION BY MR. CASTILLO                   138
     CROSS-EXAMINATION BY MS. TAL                        155

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
1    SO THAT I CAN BE ACCURATE.  MS. BUGGS TOLD YOU THAT

2    MR. GODFREY HAD SAID TO HER "HE SAID 'AND IF THE

3    MOTHERFUCKER'S AROUND ME AND THE MOTHERFUCKER DID SOMETHING, I

4    DIDN'T KNOW NOTHING ABOUT IT.'"

5         SHE SAID THAT, RIGHT, DURING HER INTERVIEW?

6    A.    THAT WAS HER QUOTE AS TO WHAT MR. GODFREY HAD TOLD HER.

7    Q.    YES.  SHE ALSO SAID TO YOU THAT  -- "THAT ACCORDING TO

8    MR. GODFREY, HE WAS, LIKE, 'NOBODY COULD SAY I DID ANYTHING.'"

9         IS THAT RIGHT?

10   A.    YES.

11   Q.    HE SAID TO HER "HOW THE FUCK I'M SUPPOSED TO KNOW WHAT

12   SOMEBODY'S SUPPOSED TO DO JUST BECAUSE SOMEBODY GET IN MY CAR?

13   I DON'T KNOW WHAT THEY ABOUT TO GO DO."

14        SHE SAID THAT TO YOU, CORRECT?

15   A.    YES, SIR.

16   Q.    NOW, THE CONVERSATION THAT SHE OVERHEARS BETWEEN

17   MR. BRADFORD AND MR. GODFREY WHERE THERE'S A DISCUSSION ABOUT

18   WHAT MR.  -- WHAT THE PERSON WHO WAS BEING SHOT AT SAID -- DO

19   YOU REMEMBER THAT?

20   A.    YES, SIR.

21   Q.    THAT CONVERSATION -- THOSE WORDS ABOUT THE PERSON

22   SAYING SOMETHING TO THE EFFECT OF, "YOU GOT THE WRONG GUY," IT

23   WAS MR. BRADFORD SAYING THAT TO MR. GODFREY?

24   A.    YES, SIR.

25   Q.    AND MY LAST QUESTION, SERGEANT, IS DURING YOUR

26   INTERVIEW WITH MS. BUGGS, SHE TOLD YOU THAT SHE DID NOT SEE A

27   GUN ON MR. GODFREY ON THE DAY OF THE INCIDENT; IS THAT RIGHT?

28   A.    YES, SIR.
```

1          MR. CASTILLO:  THAT'S ALL I HAVE AT THIS POINT, YOUR

2    HONOR.  THANK YOU, SERGEANT.

3          THE COURT:  MS. TAL.

4          MS. TAL:  THANK YOU.

5                        CROSS-EXAMINATION

6    BY MR. CASTILLO:

7    Q.    GOOD MORNING.

8    A.    GOOD MORNING.

9    Q.    SO GOING BACK TO JULY 10TH OF 2014, YOU ARE A HOMICIDE

10   DETECTIVE AND THIS INCIDENT OCCURS AT ABOUT 8:45, 8:43 P.M.

11   CORRECT?

12   A.    YES, MA'AM.

13   Q.    THAT'S WHEN YOU RECEIVE THE SHOTS FIRED FOR --

14   A.    THAT'S WHEN THE DEPARTMENT REGISTERED THE SHOTS FIRED,

15   YES.

16   Q.    AND YOU ARRIVE AT THE LOCATION AT WHAT TIME?

17   A.    PROBABLY ABOUT AN HOUR LATER.

18   Q.    SO I'M LOOKING AT YOUR I-A-R HERE WHICH YOU'VE HAD AN

19   OPPORTUNITY TO LOOK AT, RIGHT?

20   A.    YES, MA'AM.

21   Q.    AND YOU SAY "2330 HOURS OFFICER TRAN AND I ARRIVED AT

22   THE SCENE."  SO THAT'S ABOUT 11:30 AT NIGHT?

23   A.    YES, MA'AM.

24   Q.    SO THIS IS ABOUT WHAT?  THREE HOURS LATER?

25   A.    THREE HOURS AFTER THE SHOT SPOTTER CAME OUT, YES.

26   Q.    SO AT THAT POINT WHEN YOU ARRIVE, QUITE A LOT HAS

27   HAPPENED BY THEN.  THERE'S MANY POLICE OFFICERS AROUND,

28   CORRECT?

1    A.    YES, MA'AM.

2    Q.    AND, UM -- THE UM -- MR. OCON IS NO LONGER ON THE

3    SCENE, CORRECT?

4    A.    CORRECT.

5    Q.    SO YOU DON'T HAVE ANY SORT OF INTERACTION WITH HIM AT

6    THE SCENE, CORRECT?

7    A.    YES.

8    Q.    AND AT THAT TIME, YOU SPEAK WITH OFFICER POLANCO OR

9    OFFICER LAWSON ABOUT HIS CONVERSATION WITH MR. OCON?

10   A.    YES.

11   Q.    DO YOU RECALL WHICH ONE?

12   A.    BELIEVE IT WAS POLANCO.

13   Q.    AND THEY TELL YOU THAT MR. OCON WAS UNCOOPERATIVE,

14   CORRECT?

15   A.    I RECALL HE TOLD ME THAT MR. OCON HAD BEEN SHOT.  I

16   DON'T RECALL HIM SAYING HE WAS UNCOOPERATIVE.

17   Q.    YOU DON'T RECALL THEM SAYING THAT HE WAS UNCOOPERATIVE?

18         THE COURT:  IS THERE A QUESTION?  IS THERE A QUESTION

19   POSED OR DID HE ANSWER THE QUESTION?

20         MS. TAL:  I THINK YOU ANSWERED, RIGHT?

21         THE COURT:  OKAY.

22   BY MS. TAL:

23   Q.    HAVE YOU HAD, AS A PART OF YOUR INVESTIGATION, AN

24   OPPORTUNITY REVIEW OF THE SOME OF THE OTHER OFFICER'S REPORTS

25   THAT WERE WRITTEN IN THIS CASE?

26   A.    YES, MA'AM.

27   Q.    AND, UM, DO YOU RECALL THAT -- THAT OFFICER PEREZ AND

28   POLANCO STATED IN THEIR REPORTS THAT MR. OCON WAS

1   UNCOOPERATIVE WITH THEM?

2   A.      I RECALL OFFICER POLANCO STATING THAT MR. OCON WAS SHOT

3   AND DID NOT WANT TO RECEIVE FIRST-AID FROM EITHER OF THE

4   OFFICERS ON SCENE, DID NOT WANT TO WAIT FOR AN AMBULANCE, AND

5   GOT A RIDE TO THE HOSPITAL FROM HIS SELF-IDENTIFIED RELATIVES.

6   SO IF THAT'S UNCOOPERATIVE, THEN, YES.

7   Q.      AND AS FAR AS YOU KNOW, NO ONE SEARCHED MR. OCON PRIOR

8   TO HIM LEAVING TO GO TO THE HOSPITAL, AS FAR AS LAW

9   ENFORCEMENT, TO SEE IF HE HAD ANY SORT OF WEAPONS ON HIM,

10  CORRECT?

11  A.      I DON'T KNOW IF THEY DID OR NOT.

12  Q.      YOU DON'T HAVE ANY INFORMATION THAT THEY DID, RIGHT?

13  A.      NO, MA'AM.

14  Q.      AND FROM WHAT YOU KNOW, OFFICER LAWSON TOOK A STATEMENT

15  FROM MR. OCON AT THE HOSPITAL, CORRECT?

16  A.      I BELIEVE SO, YES.

17  Q.      AND MR. OCON TOLD HIM THAT -- THAT IS, OFFICER LAWSON,

18  HE DIDN'T KNOW THE PERSON THAT HAD SHOT HIM OR WHAT THEY

19  LOOKED LIKE, CORRECT?

20  A.      YES, MA'AM.

21  Q.      ALSO, WITNESSES, FROM WHAT YOU GATHERED, OBSERVED

22  MR. OCON MOVING UNKNOWN OBJECTS AROUND THE CAR PRIOR TO

23  LEAVING THE CAR AND HEADING TO THE HOSPITAL.  DO YOU REMEMBER

24  THAT?

25  A.      DO I REMEMBER READING THAT IN THE REPORT?

26  Q.      DO YOU REMEMBER WRITING THAT IN YOUR REPORT?

27  A.      CAN YOU RESTATE THE QUESTION FOR ME?

28  Q.      THAT YOU RECEIVED INFORMATION THAT, UM, MR. OCON WAS

1    KIND OF SHUFFLING AROUND, MOVING THINGS AROUND THE CAR PRIOR

2    TO LEAVING FOR THE HOSPITAL?

3    A.    YES, MA'AM.

4    Q.    DID YOU EVER DETERMINE WHAT HE WAS DOING?

5    A.    NO, I DID NOT.

6    Q.    NOW, THE CAR -- THE 2014 CHRYSLER 300 THAT MR. OCON WAS

7    IN WAS A RENTAL AS WELL, CORRECT?

8    A.    CORRECT.

9    Q.    DID YOU CONDUCT ANY SORT OF SEARCH ON THAT CAR?

10   A.    I BELIEVE A SEARCH WARRANT WAS EFFECTED FOR THE

11   VEHICLE, YES.

12   Q.    AND THAT WAS ABOUT TWO DAYS AFTER THE HOMICIDE,

13   CORRECT?

14   A.    YES, MA'AM.

15   Q.    THE KEY IGNITION IN THAT CAR APPEARED TO BE DAMAGED.

16   DO YOU RECALL SEEING THAT?

17   A.    I DON'T RECALL SEEING THAT.

18   Q.    NOW, ONE OF THE INDIVIDUALS THAT WERE CONTACTED AS A

19   WITNESS TO THIS INCIDENT WAS A MR. ROCHE WHO WAS PARKED IN

20   FRONT OF WENDY'S; IS THAT CORRECT?

21   A.    YES, MA'AM.

22   Q.    ACCORDING TO MR. ROCHE, HE SAW SOMEONE WALK UP TO THE

23   DOOR AND ATTEMPT TO OPEN IT BUT IT WAS LOCKED, CORRECT?

24   A.    YES, MA'AM.

25   Q.    AND --

26         THE COURT:  IS THAT THE CAR DOOR OR THE BUSINESS DOOR?

27         MS. TAL:  THE WENDY'S DOOR.

28         THE COURT:  OKAY.

1  BY MS. TAL:

2  Q.    AND MR. ROCHE SAID HE NEVER SAW A GUN, CORRECT?

3  A.    YES, MA'AM.

4  Q.    AND HE ALSO, UM, NEVER WAS ABLE TO --

5        WELL, WHAT HAPPENED IS HE WAS SHOWN A LINEUP OF

6  PICTURES, CORRECT?

7  A.    MR. ROCHE?

8  Q.    YES.

9  A.    YES, MA'AM.

10 Q.    AND HE WAS NOT ABLE TO IDENTIFY ANYONE, CORRECT?

11 A.    CORRECT.

12 Q.    ONE OF THOSE PEOPLE -- ONE OF THE PERSONS IN THE

13 PHOTOGRAPHS THAT WERE SHOWN TO HIM WAS, IN FACT, MR. BRADFORD,

14 CORRECT?

15 A.    YES, MA'AM.

16 Q.    ONE OF THE WITNESSES IN THIS CASE WAS ALSO A DERICK

17 ALMENA, CORRECT?

18 A.    YES, MA'AM.

19 Q.    AND HE DID NOT PROVIDE YOU ANY IDENTIFICATION OF

20 MR. BRADFORD, CORRECT?

21 A.    YES, MA'AM.

22 Q.    THERE WAS ALSO MICHAH ALLISON WHO WAS ALSO ONE OF THE

23 WITNESSES TO THE SHOOTING, CORRECT?

24 A.    YES, MA'AM.

25 Q.    AND SHE WAS NOT ABLE TO PROVIDE AN IDENTIFICATION OF

26 MR. BRADFORD, CORRECT?

27 A.    CORRECT.

28 Q.    AND WITH REGARDS TO ANY OTHER WITNESSES THAT WERE

1    PRESENT, I BELIEVE THERE WAS A MATT JONES, CORRECT?

2    A.    YES, MA'AM.

3    Q.    AND HE ALSO WAS NOT ABLE TO IDENTIFY MR. BRADFORD,

4    CORRECT?

5    A.    YES, MA'AM.

6    Q.    AND AGAIN, FOR THE PHOTO LINEUP WITH MR. JONES,

7    MR. BRADFORD WAS ACTUALLY ONE OF THE PHOTOGRAPHS SHOWN TO

8    MR. JONES, CORRECT?

9    A.    YES, MA'AM.

10   Q.    NOW, THE WENDY'S SURVEILLANCE THAT YOU OBTAINED WAS

11   ONLY FROM THE INSIDE -- CAMERAS ON THE INSIDE OF THE WENDY'S,

12   CORRECT?

13   A.    YES, MA'AM.

14   Q.    YOU WERE NOT ABLE TO OBTAIN ANY SURVEILLANCE FROM THE

15   EXTERIOR OF THE WENDY'S WHERE THIS INCIDENT OCCURRED, CORRECT?

16   A.    CORRECT.

17   Q.    WHAT YOU HAD WAS SOME KIND OF BLURRY PICTURE OF AN

18   INDIVIDUAL AT THE DOOR OF THE WENDY'S, CORRECT, THAT YOU

19   OBTAINED FROM THE WENDY'S SURVEILLANCE?

20   A.    YES.

21   Q.    AND NO ONE THAT WAS A WITNESS IN THIS CASE WAS ABLE TO

22   IDENTIFY MR. BRADFORD AS, UM, THE PERSON IN THAT PHOTOGRAPH OF

23   THE PERSON SORT OF REACHING AT THE DOOR, CORRECT?

24   A.    CORRECT.

25   Q.    ALSO, YOU ACTUALLY TRIED TO GET FINGERPRINT TESTING

26   DONE OF THAT WENDY'S DOOR TO SEE IF -- TO COMPARE TO

27   MR. BRADFORD'S FINGERPRINTS, CORRECT?

28   A.    YES, MA'AM.

1  Q.     AND THAT WAS NOT DETERMINED TO BE MR. BRADFORD,

2  CORRECT?

3  A.     CAN YOU REPHRASE IT?

4  Q.     THE FINGERPRINTS THAT WERE COMPARED -- ANY FINGERPRINTS

5  THAT WERE OBTAINED FROM THE WENDY'S DOOR WHERE THIS PERSON IS

6  OBSERVED TRYING TO OPEN THE DOOR WERE COMPARED TO

7  MR. BRADFORD'S AND IT WAS NOT CONCLUDED THAT THEY WERE THE

8  SAME, CORRECT?

9  A.     IF ANY PRINTS WERE RECOVERED FROM THE DOOR, THOSE

10 PRINTS WERE DETERMINED TO NOT BE MR. BRADFORD'S.  IS THAT YOUR

11 QUESTION?

12 Q.     YES.

13 A.     YES.

14 Q.     WITH REGARDS TO THE RENTAL CAR, THE 2013 BLACK FORD

15 ESCAPE, AS FAR AS ANY SORT OF SURVEILLANCE, OTHER THAN WHAT

16 WAS DESCRIBED BY MS. BUGGS, THERE'S NEVER ANY -- ANY

17 EVIDENCE -- ANY PHYSICAL EVIDENCE -- LET'S START WITH,

18 MR. BRADFORD WAS EVER EVEN INSIDE THAT CAR, CORRECT?

19 A.     CORRECT.

20 Q.     AND, UM, OTHER THAN AGAIN WHAT YOU SPOKE ABOUT WITH

21 MR. BUGGS, MR. BRADFORD WAS NEVER SEEN IN THAT CAR, CORRECT,

22 BY -- OTHER THAN WHAT MR. BUGGS HAD TOLD YOU --

23        THE COURT:  WHEN YOU SAY "MR. BUGGS," DO YOU MEAN

24 MS. BUGGS?

25 BY MS. TAL:

26 Q.     I'M SAYING MR. BRADFORD WAS NEVER SEEN IN THAT 2013

27 BLACK FORD ESCAPE?

28 A.     AT THIS POINT I HAVE -- NOBODY HAS TOLD ME THAT THEY

1   HAVE SEEN MR. BRADFORD PREVIOUSLY INSIDE THAT BLACK FORD

2   ESCAPE.

3   Q.    AND YOU DON'T HAVE ANY SURVEILLANCE SHOWING

4   MR. BRADFORD EVER AT ANY TIME INSIDE THAT BLACK FORD ESCAPE,

5   CORRECT?

6   A.    CORRECT.

7   Q.    NOW, YOU TALKED TO MS. BUGGS OR -- EXCUSE ME.  I

8   WITHDRAW THAT.

9         YOU OBTAINED INFORMATION FROM THE CAR RENTAL, HERTZ CAR

10  RENTAL -- OR THE DOLLAR CAR RENTAL THAT THAT CAR WAS RETURNED

11  ON JULY 12TH OF 2014?

12  A.    CORRECT.

13  Q.    AND -- I'LL MOVE ON.  I'LL GO BACK.

14        WITH REGARDS TO YOUR INTERVIEW WITH MS. BUGGS, AGAIN,

15  IT WAS SORT OF DISCUSSED A BIT, BUT SHE IS IN A MOTEL ROOM AT

16  AROUND 5:00 IN THE MORNING ON JULY 17TH, 2015 AND SHE'S

17  ARRESTED AND BROUGHT IN FOR AN INTERVIEW, CORRECT?

18  A.    CORRECT.

19  Q.    AND ONE OF THE THINGS THAT SHE TELLS YOU IS THAT HER

20  AND MR. GODFREY HAD BEEN IN AN ON-AND-OFF RELATIONSHIP,

21  CORRECT?

22  A.    YES.

23  Q.    SHE SAID THEY HAD BEEN ARGUING OVER MR. GODFREY

24  THINKING THAT SHE WAS GAY.  DO YOU REMEMBER HER SAYING THAT?

25  A.    YES, MA'AM.

26  Q.    AND SHE ALSO WAS UPSET AT HIM AND HAD ISSUES WITH HIM

27  OVER HIM BEING INVOLVED WITH SEVERAL OTHER WOMEN, CORRECT?

28  A.    I DON'T KNOW IF SHE WAS UPSET, BUT, YES.

1    Q.    YOU DON'T KNOW IF SHE WAS UPSET?

2    A.    I DON'T REMEMBER HER BEING UPSET.

3    Q.    DO YOU THINK SHE WAS -- DO YOU RECALL HER HAVING ANY

4    SORT OF EMOTION THAT YOU OBSERVED ABOUT, OR HER EXPRESSING

5    ANYTHING ABOUT HIM BEING WITH OTHER WOMEN?  WAS SHE HAPPY

6    ABOUT IT AS FAR AS YOU COULD TELL?

7    A.    NOT AS FAR AS I COULD TELL.

8    Q.    SHE TOLD YOU SHE WAS A PROSTITUTE, RIGHT?

9    A.    YES, MA'AM.

10   Q.    SHE TOLD YOU SHE USED TO LOVE MR. GODFREY, BUT NOW HE'S

11   DEALING WITH OTHER FEMALES.  DO YOU RECALL HER SAYING THAT?

12   A.    YES.

13   Q.    DO YOU RECALL HAVING A DISCUSSION WITH HER AND

14   CONFRONTING HER ABOUT THE FACT THAT SHE WAS A DRUG DEALER

15   FOR -- TELLING HER THAT SHE WAS A DRUG DEALER FOR MR. GODFREY?

16   A.    YES.

17   Q.    AND THAT SHE WAS SORT OF HANDLING HIS BUSINESS FOR HIM?

18   A.    YES.

19   Q.    AND THAT SHE SORT OF IS IN A SITUATION WHERE SHE BETTER

20   SORT OF TELL YOU SOME STUFF BECAUSE SHE SORT OF -- SHE FOUND

21   HERSELF UNDER SURVEILLANCE AS A PART OF THIS WIRE TAP

22   CONSPIRACY AND THAT YOU WERE AWARE OF THIS -- HER INVOLVEMENT?

23   A.    I'M SORRY.  WHAT'S THE QUESTION?

24   Q.    DID YOU HAVE A DISCUSSION WITH HER THROUGHOUT YOUR

25   INTERVIEW WITH HER WHERE YOU MADE HER AWARE THAT YOU AND OTHER

26   LAW ENFORCEMENT, THE FBI HAD OBSERVED THAT SHE WAS DEEPLY

27   INVOLVED IN THIS ENTERPRISE AND THAT YOU HAD SEEN THAT SHE WAS

28   A PART OF IT THROUGH YOUR WIRE TAPPING AND YOUR OTHER

1   INVESTIGATION?  DID YOU CONFRONT HER ABOUT THAT?

2   A.    ASIDE FROM THE WORD "DEEPLY," YES.

3   Q.    YOU ASKED HER IF SHE EVER SAW A GUN ON JULY 10TH OF

4   2014 AND SHE SAID SHE DID NOT, CORRECT?

5   A.    YES, MA'AM.

6   Q.    SHE SAID SHE WAS DROPPED OFF AT AROUND 3:00 P.M.

7   EARLIER THAT DAY BY MR. GODFREY, CORRECT?

8   A.    THAT WAS HER GUESS, YES.

9   Q.    AND SHE SAID SEVERAL HOURS LATER WHEN IT WAS DARK OUT

10  IS WHEN HE PICKED HER UP; IS THAT CORRECT?

11  A.    YES.

12  Q.    WAS SHE ABLE TO TELL YOU WHAT TIME IT WAS WHEN HE

13  PICKED HER UP?

14  A.    NO, MA'AM.

15  Q.    BUT FROM YOUR UNDERSTANDING, IT APPEARED THAT IT WAS

16  LATE IN THE EVENING?

17  A.    CORRECT.

18  Q.    AND AT THAT TIME MR. GODFREY WAS ALONE, CORRECT?

19  A.    CORRECT.

20  Q.    THERE WAS NO DISCUSSION WITH MR. GODFREY ABOUT WHERE

21  MR. BRADFORD HAD GONE AT THAT POINT, CORRECT?

22  A.    YES.

23  Q.    AND SHE DIDN'T KNOW WHERE HE WAS, CORRECT?

24        THE COURT:  IS THAT, YES, THERE WAS NO DISCUSSION?

25        THE WITNESS:  I WAS AGREEING WITH WHATEVER HER

26  STATEMENT IS.

27        THE COURT:  OKAY.

28        THE WITNESS:  SORRY.

```
 1   BY MS. TAL:

 2   Q.     SO THERE WAS NO -- WAS THERE A DISCUSSION BETWEEN

 3   MS. BUGGS AND MR. GODFREY ABOUT WHERE MR. BRADFORD WAS WHEN

 4   MR. GODFREY PICKED HER UP?

 5   A.     I DON'T KNOW IF THEY HAD A DISCUSSION ABOUT THAT.

 6   Q.     BUT YOU DIDN'T GET ANY INFORMATION THAT THEY DID,

 7   CORRECT?

 8   A.     CORRECT.

 9   Q.     SHE SAID SHE NEVER HEARD MR. GODFREY SAY ANYTHING ABOUT

10   PAYING ANYONE TO DO ANY SORT OF VIOLENT ACT OR ANYTHING ELSE

11   FOR HIM, CORRECT?

12   A.     CORRECT.

13   Q.     DO YOU REMEMBER HER SAYING THAT?

14   A.     MS. BUGGS?

15   Q.     YES.

16   A.     CORRECT.

17   Q.     DO YOU RECALL HER SAYING THAT THE LAST PERSON SHE SAW

18   IN THE CAR WITH MR. GODFREY WHEN SHE WAS DROPPED OFF AT ABOUT

19   3:00 P.M. WAS DWIGHT, BUT THERE COULD HAVE BEEN OTHER PEOPLE

20   IN THE CAR AFTER THAT?  DO YOU RECALL HER SAYING THAT?

21   A.     YES.

22   Q.     DO YOU RECALL HER SAYING THERE WAS NO TALK AT ALL OF

23   ANY SORT OF MURDER OR WENDY'S IN THE CAR?  THIS IS IN THE

24   BLACK FORD ESCAPE PRIOR TO HER GETTING DROPPED OFF.  THERE WAS

25   NO DISCUSSION LIKE THAT OF ANY SORT BETWEEN MR. BRADFORD AND

26   MR. GODFREY?  DO YOU RECALL HER SAYING THAT?

27   A.     AT WHICH POINT?

28   Q.     YOU ASKED HER IF THERE WAS ANY TALK OF THE MURDER IN
```

1    THE CAR PRIOR TO HER GETTING DROPPED OFF AND SHE SAID THERE

2    WAS NOT.

3    A.    THIS IS EARLY ON IN THE INTERVIEW OR LATER BECAUSE SHE

4    PROVIDED TWO DIFFERENT ANSWERS TO THE QUESTION.

5    Q.    DURING YOUR INTERVIEW WITH HER.  AND I CAN READ IT TO

6    YOU FROM THE TRANSCRIPT SO I'M NOT MISSTATING IT.

7          SO INTERVIEWER, "OKAY.  OKAY --"

8          MR. IKUMA:  IS THERE A PAGE?

9          MS. TAL:  WELL, IT'S 173 OF MY TRANSCRIPT.  AND I THINK

10   YOURS IS ABOUT THREE PAGES BEFORE THAT.

11   Q.    SO INTERVIEWER, "OKAY.  SHE WAS IN, RIGHT?  AND SO THE

12   JUDGE SAID, HEY, LOOK.  SHE'S IN THE CAR RIGHT BEFORE THE

13   MURDER GOES DOWN.  SHE IS IN THE CAR RIGHT AFTER THE MURDER

14   GOES DOWN.  IT'S REALLY HARD TO BELIEVE THAT NOBODY REALLY

15   TALKS ABOUT IT. "

16         ASHLEY BUGGS, "NOBODY TALKED ABOUT IT.  AND, UM, I CAN

17   TELL YOU WHERE I ENDED UP AFTER THAT AND EVERYTHING."

18         "OKAY.  WHERE DID YOU END UP?"

19         "UM, MOTEL 6."

20         INTERVIEWER, "WHICH ONE?"

21         "UM, IN VALLEJO."

22         DO YOU REMEMBER THAT CONVERSATION?

23   A.    YES, MA'AM.

24         THE COURT:  WHAT PAGE IS IT ON IN YOUR TRANSCRIPT?

25         MS. TAL:  ON MY TRANSCRIPT IT'S 173.

26         THE COURT:  OKAY.

27         MS. TAL:  AND --

28         THE COURT:  I'LL LOOK AROUND.